# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

| | | |
|---|---|---|
| ANTHONY D. BARNETT, | * | |
| | * | |
| Plaintiff, | * | |
| | * | CIVIL ACTION NO.: CV213-073 |
| | * | |
| v. | * | |
| | * | |
| HEALTHCARE STAFFING, INC., | * | |
| GATEWAY BEHAVIORAL HEALTH | * | |
| SERVICES, KRISTINE WALDRON, | * | |
| VANESSA SHEARER, and CATHY | * | |
| THOMPSON, | * | |
| | * | |
| Defendants. | * | |

## ORDER

Presently before the Court are two separate Motions for Summary Judgment: the first filed by Defendants Healthcare Staffing, Inc. ("HCS") and Kristine Waldron, dkt. no. 36, and the second filed by Defendants Gateway Behavioral Health Services ("Gateway"), Vanessa Shearer, and Cathy Thompson (collectively "the Gateway Defendants"), dkt. no. 37. Plaintiff filed Responses to these separate Motions. Dkt. Nos. 51, 52. Each group of Defendants filed a Reply. Dkt. Nos. 54, 55. For the following reasons, Defendants' Motions are **GRANTED**.

Defendant HCS is a company which, since the year 2000, has "specialize[d] in providing staffing services for health care facilities[.]" Dkt. No. 36-1, p. 1. Defendant HCS had a contract to provide staffing services to Defendant Gateway, which is a community service board created by the Georgia legislature. Id., Dkt. 36-2, p.2. Gateway serves Georgia's coastal counties and provides "assistance to individuals and their families experiencing disabling effects of mental illness, developmental disability, and addictive diseases." Id.

Per the terms of the contract between HCS and Gateway, HCS accepts applications from potential employees and screens applicants to be assigned to Gateway, but Gateway is to approve any applicant before he works at Gateway. Id. at p. 3. HCS pays and employs an individual during his assignment at Gateway, but Gateway and its employees manage and control the HCS employee. Id. Gateway determines the criteria, such as level of education, credentials, and licenses an individual must possess before he is assigned to Gateway. Gateway also

---

[1] The Court views the evidence in the light most favorable to Plaintiff, as it must do with a motion for summary judgment. However, Plaintiff's Second Amended Complaint is short on facts, and his Statements of Material Facts filed in response to Defendants' Motions cite to nothing of record other than his own Complaint, with very few exceptions. Specifically, Plaintiff points to his deposition testimony and an exhibit attached to the deposition transcript only in a general manner to admit or deny certain statements the Gateway Defendants made in their Statement of Material Facts. See Dkt. No. 51-2, p. 4. Nonetheless, the Court has taken care to view the record in light of Plaintiff's best case.

determines the compensation to be paid, whether the compensation will be on an hourly or salaried basis, and whether to terminate the "positions being filled by employees staffed by" HCS employees. Id. HCS employees assigned to Gateway work at Gateway facilities. Id. at p. 4. Defendant Vanessa Shearer is the Human Resources Director for Gateway and coordinates with HCS to fill Gateway's staffing needs. Dkt. 37-2, p. 3.

Plaintiff applied with HCS for a nursing position on the Assertive Community Treatment ("ACT") team at Gateway on August 30, 2011. Dkt. No. 36-2, p. 4; Dkt. No 36-4, p. 5, ¶ 22. Plaintiff received a Bachelor of Nursing degree from Tuskegee University in 1982 and has worked in the psychiatric nursing field for approximately 30 years' time. To be eligible for the position at Gateway, Plaintiff had to pass a series of tests, including clinical and pharmacology tests. Dkt. No. 36-2, p. 5. Plaintiff passed these tests after more than one attempt and was approved to be a nurse on the ACT team at Gateway. Id. Plaintiff began working at Gateway on September 28, 2011, and he received a copy of the HCS employee handbook on October 3, 2011. Id.; Dkt. No. 36-4, p. 6, ¶¶ 25, 26. Plaintiff was employed by HCS from September 2011, until his termination on or about July 9, 2012. Dkt. 9, ¶¶ 14, 35.

Gateway set Plaintiff's hours, schedule, and pay. Plaintiff reported to Nina Kennedy, an employee of Gateway, and Ms.

Kennedy and other Gateway managers supervised Plaintiff. Dkt. No. 36-2, p. 6. The only matter Plaintiff reported to HCS was the hours he worked. Id. Ms. Kennedy issued a written reprimand to Plaintiff on November 16, 2011, based on his lateness, a policy violation, and the quality of work produced. Dkt. No. 36-4, p. 48; Dkt. No. 37-2, p. 6.

While Plaintiff worked at the ACT, Defendant Kristine Waldron was working as the Acting Nurse Manager at Gateway. Dkt. No. 37-2, p. 7. Defendant Waldron noticed Plaintiff would package drugs and medications in pill containers prior to his visits with consumers, which was against policy and the law. Id. Defendant Waldron also noticed there were some narcotic drugs missing, and Plaintiff admitted to repacking the consumers' medications. Id. Defendant Waldron voiced her concerns to Ms. Kennedy. Id. at p. 8.

Plaintiff later requested a transfer from the ACT team to the Crisis Stabilization Unit ("CSU"), and Gateway approved this request on or around February 15, 2012. Dkt. No. 36-2, p. 6. Plaintiff worked the weekend night shifts. Dkt. No. 37-2, p. 8. Defendant Cathy Thompson, an employee of Gateway, was Plaintiff's supervisor on the CSU. Dkt. No. 36-2, p. 6. As with the ACT team, in this new position, the only matter Plaintiff reported to HCS was his hours worked. Id. at p. 7.

Defendant Thompson is the manager in charge of the CSU at Gateway. Dkt. No. 37-3, p. 2. Defendant Waldron reported the issues she had had with Plaintiff while he was in the ACT to Defendant Thompson. Dkt. No. 37-2, p. 8. During the week of June 25, 2012, Defendant Thompson notified HCS that Plaintiff was not to return to the CSU because of unsatisfactory job performance. Based on the contract between HCS and Gateway, HCS was required to remove Plaintiff from his assignment in the CSU. Dkt. No. 36-2, p. 7. Hayley Barr of HCS left a voicemail for Plaintiff to return her call, but Plaintiff did not receive this message until after HCS's offices were closed. When Plaintiff came to work at the CSU on June 29, 2012, Defendant Thompson informed him that she did not want him working in the CSU any longer. Id.; Dkt. No. 36-7, pp. 107, 110.

Following the termination of his employment at Gateway, HCS attempted to find Plaintiff another assignment, but these efforts were not successful. Dkt. No. 37-2, p. 10. HCS issued a separation notice to Plaintiff on July 9, 2012. Dkt. No. 36-7, pp. 113-14, 117; Dkt. No. 36-2, p. 7. Plaintiff filed complaints against HCS and Gateway with the Equal Employment Opportunity Commission ("EEOC"). On both complaints, the EEOC issued Plaintiff a right to sue letter after determining that it was unable to conclude that the information gathered established violations of the statutes. Dkt. Nos. 9-1, 9-2.

Plaintiff is a black male, and he claims he was fired solely because of his race and gender and was replaced by Defendant Waldron, a white female Plaintiff contends is less qualified than he is. Dkt. No. 9, ¶ 63. Plaintiff also claims Defendants Waldron, Shearer, and Thompson conspired to manufacture reasons to terminate him. Dkt. No. 52-1, p. 4. Plaintiff seeks relief under 42 U.S.C. § 2000e, *et seq.* (Title VII of the Civil Rights Act of 1964, or "Title VII"), 42 U.S.C. §§ 1981 and 1981a, 42 U.S.C. § 1985, 42 U.S.C. § 1983, 42 U.S.C. § 1988, and under Georgia law for intentional infliction of emotional distress. Dkt. No. 9, ¶¶ 66, 87, 108, 132, 167, 199, 219, 248, 277.

Defendants state Plaintiff was not discriminated against based on his race or gender or treated unlawfully. Dkt. No. 36-1, p. 2; Dkt. No. 37-1, p. 3. Rather, Defendants HCS and Waldron state Plaintiff "refuses to recognize that his own actions . . . resulted in the termination of his employment[.]" Dkt. No. 36-1, p. 2. The Gateway Defendants maintain there is no basis for Plaintiff's claims against them. Dkt. No. 37-1, p. 3.

### SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."

FED. R. CIV. P. 56(a). "A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, there must exist a conflict in substantial evidence to pose a jury question." Hall v. Sunjoy Indus. Grp., Inc., 764 F. Supp.2d 1297, 1301 (M.D. Fla. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and (Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989)).

The moving parties bear the burden of establishing that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. See Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving parties must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant[s are] entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving parties may discharge their burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex v. Catrett, 477 U.S. 317, 322-23 (1986)). In determining whether a summary judgment motion

should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., Fla., 630 F.3d 1346, 1353 (11th Cir. 2011).

## DISCUSSION

The instant Motions require the Court to apply the above-explained summary judgement standard to each claim within Plaintiff's Second Amended Complaint.[2] While the Gateway Defendants have filed a separate motion from Defendants HSC and Waldron, much of the analysis applies equally to both motions.

## I. Discrimination (Counts I through IV of Plaintiff's Second Amended Complaint)

Title VII makes it unlawful for an employer to "discharge . . . or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . . [or] sex[.]" 42 U.S.C. § 2000e-2(a)(1). Under 42 U.S.C. § 1981, "[a]ll

---

[2] "'As a general rule, an amended complaint supersedes and replaces the original complaint unless the amendment specifically refers to or adopts the earlier pleading.'" Schreane v. Middlebrooks, 522 F. App'x 845, 847 (11th Cir. 2013)(quoting Varnes v. Local 91, Glass Bottle Blowers Ass'n of U.S. & Canada, 674 F.2d 1365, 1370 n.6 (11th Cir. 1982)). "Once the district court accepts the amended pleading, 'the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary.'" Id. (quoting Pintando v. Miami-Dade Hous. Agency, 501 F.3d 1241, 1243 (11th Cir. 2007) (quotation omitted)). Plaintiff filed an original Complaint and two amendments thereto. In his amendments, Plaintiff does not refer to or adopt his earlier pleadings. Accordingly, the assertions contained in Plaintiff's Second Amended Complaint frame the issues before the Court.

persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). "The rights protected by [Section 1981] are protected against impairment by nongovernmental discrimination[.]" 42 U.S.C. § 1981(c).

Claims of race discrimination under Section 1981 are analyzed in the same manner as claims brought under Title VII. Coar v. Pemco Aeroplex, Inc., 372 F. App'x 1, 2 (11th Cir. 2010) (citing Rice-Lamar v. City of Fort Lauderdale, Fla., 232 F.3d 836, 843 n.11 (11th Cir. 2000)). Likewise, claims involving gender discrimination are analyzed in much the same manner as racial discrimination claims under Title VII. See Quigg v. Thomas Cnty. Sch. Dist., No. 7:12-CV-153, 2014 WL 4442029, at *11 (M.D. Ga. Sept. 9, 2014) (citing Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1275 n.5 (11th Cir. 2008), and Matthews v. Columbia Cnty., 294 F.3d 1294, 1297 (11th Cir. 2002)); Apodaca v. Sec'y of Dep't of Homeland Sec., 161 F. App'x 897, 899 (11th Cir. 2006).

A plaintiff's claim of racial discrimination may be established by statistical or anecdotal proof, direct evidence, or circumstantial evidence. Id.; Van Voorhis v. Hillsborough

Cnty. Bd. of Cnty. Comm'rs, 512 F.3d 1296, 1300 (11th Cir. 2008). A plaintiff's claim of gender-based discrimination can be established by direct or circumstantial evidence. Lawver v. Hillcrest Hospice, Inc., 300 F. App'x 768, 771 (11th Cir. 2008) (citing EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002)).[3] The Court will address whether Plaintiff could establish discrimination at trial using any of these avenues of proof.

### A.  Statistical and Anecdotal Proof (Pattern and Practice Claim)

Plaintiff does not base a pattern and practice claim on statistical proof. See generally, Dkt. No. 9. However, to the extent Plaintiff seeks to set forth a pattern and practice claim based on anecdotal evidence, his attempt fails.

A pattern and practice claim either may be brought by a governmental entity (specifically the EEOC) "if there is reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of discrimination, or by a class of private plaintiffs under 42 U.S.C. § 2000e, et. seq.[.]" Joe's Stone Crab, 220 F.3d at 1286 (internal citations omitted). For such claims, the plaintiff must establish "that

---

[3] Defendants HCS and Waldron assert Plaintiff's Title VII claims against Defendant Waldron must fail because she is not an employer and had no power or authority to terminate Plaintiff. Dkt. No. 36-1, pp. 13-14. Plaintiff agrees. Dkt. No. 52-1, p. 7. Therefore, the Court's focus on the Title VII analysis will be on Plaintiff's contentions against Defendant HCS and the Gateway Defendants and their alleged actions.

[the] discrimination was the company's standard operating procedure." Id. "To meet this burden of proof, a plaintiff must 'prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts. [The plaintiff] ha[s] to establish by a preponderance of the evidence that [ ] discrimination [is] the company's standard operating procedure— the regular rather than unusual practice.'" Id. at 1286-87 (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977) (alterations in original)). A plaintiff may establish a pattern or practice claim "through a combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally." Id. at 1287. "[I]n determining pattern or practice liability, the government is not required to prove that any particular employee was a victim of the pattern or practice; it need only establish a prima facie case that such a policy existed." Id.

In this case, no governmental agency filed suit on behalf of Plaintiff based on Defendants' alleged pattern or practice of discrimination. Nor did a class of plaintiffs file this cause of action. Thus, Plaintiff cannot sustain a "pattern and practice claim" for racial or gender discrimination. Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 964-65 (11th Cir. 2008) (noting that the Government may bring a pattern and

practice claim on behalf of a class of similarly situated employees or as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2)). Assuming, *arguendo*, that Plaintiff could proceed with this claim, he fails to provide evidence which establishes the existence of a genuine dispute whether Defendant HCS and the Gateway Defendants engaged in a pattern and practice of discrimination. In fact, Plaintiff fails to present any evidence in this regard.

### B. Direct Evidence

Plaintiff does not rely on direct evidence[4] as support for his discrimination claims. See Van Voorhis, 512 F.3d at 1300 (finding alleged statement that prospective employer did not want to hire any old pilots direct evidence of age discrimination); Damon v. Fleming Supermrkts. of Fla., Inc., 196 F.3d 1354, 1358-59 (11th Cir. 1999) (noting that an example of direct evidence would be a management memorandum stating to fire

---

[4] The Eleventh Circuit has defined direct evidence of discrimination as:

> evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee. Direct evidence is evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption. As our precedent illustrates, only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination. If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence.

Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004) (alterations in original) (internal citations and punctuation omitted). In this case, Plaintiff does not make even a conclusory allegation that there is direct evidence to support his race and age discrimination claims.

an employee because "he is too old" and holding that direct evidence must indicate that the complained-of employment decision was motivated by the decision-maker's discriminatory intent). Thus, the Court focuses on whether circumstantial evidence supports Plaintiff's discrimination claims.

## C. Circumstantial Evidence

The "sufficiency" of disparate treatment claims based on circumstantial evidence is tested "by applying the burden-shifting framework" established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981). Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1162 (11th Cir. 2006) (citing Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000)). Under the McDonnell Douglas burden-shifting framework, "a plaintiff first must show an inference of discriminatory intent, and thus carries the initial burden of establishing a prima facie case of discrimination[,]" or disparate treatment. Brooks, 446 F.3d at 1162 (italics omitted); see also, Kelliher v. Veneman, 313 F.3d 1270, 1275 (11th Cir. 2002). To establish a prima facie case for disparate treatment in a race or age discrimination case, "the plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than

she was treated; and (4) she was qualified to do the job."
Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323 (11th
Cir. 2006); Apodaca, 161 F. App'x at 900.[5]

In support of their respective Motions, Defendants state
that: they made no adverse employment decision against
Plaintiff; Plaintiff fails to show he was treated differently
than similarly situated employees outside of Plaintiff's
protected classes; and Plaintiff was not meeting expectations at
the time of his termination. Dkt. No. 36-1, pp. 8-12; Dkt.
No. 37-1, pp. 4-5, 8-10. Conversely, Plaintiff contends:
Defendants made an adverse employment decision against him;
Defendants "went looking" for Defendant Waldron so Plaintiff
could be fired; and he was qualified to perform his job. Dkt.
No. 52-1, pp. 5-7. The Court will address these issues in turn.

### 1. Adverse employment decision

The standard for a discrimination case requires a plaintiff
to establish an "ultimate employment decision," and termination
qualifies as such a decision. Crawford v. Carroll, 529 F.3d
961, 970 (11th Cir. 2008). Thus, Plaintiff was unquestionably
subject to an adverse employment decision. However, the

---

[5] Defendants do not dispute Plaintiff is a member of protected classes based
on his race and gender, which is the first prong of establishing a *prima
facie* case of discrimination through the use of circumstantial evidence.
Dkt. No. 36-1, p. 7; Dkt. No. 37-1, p. 8. Nor do Defendants dispute
Plaintiff was subjected to an adverse employment decision. Id. at p. 4, Dkt.
No. 36-1, p. 9. Defendants do dispute whether Defendant HCS or the Gateway
Defendants are responsible for this adverse employment decision.

question remains whether the decision was made by one defendant or by multiple defendants jointly as the result of a joint employer relationship.

The Eleventh Circuit has held that the basis for finding a joint employer relationship is "'simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.'" Virgo v. Riviera Beach Assocs., Ltd., 30 F.3d 1350, 1360 (11th Cir. 1994) (internal citation omitted). "[W]hen discrimination is based on an adverse employment decision, the joint employer theory concentrate[s] on the degree of control an entity has over the adverse employment decision on which the Title VII suit is based." Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1244-45 (11th Cir. 1998). "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." Van Voorhis, 512 F.3d at 1300 (internal quotation and citation omitted).

Defendant HCS contends the decision to ask Plaintiff not to return to his assignment was made by Gateway, not HCS, and, as

such, Defendant HCS did not make the adverse employment decision.  Dkt. No. 36-1, p. 8.  Defendant HCS contends that it cannot be held liable for Defendant Gateway's determination that Plaintiff's assignment should end.  The Gateway Defendants contend that, while Gateway may be an "employer" under Title VII, it was not Plaintiff's employer and did not discharge Plaintiff.  Dkt. No. 37-1, pp. 4-5.

Plaintiff concedes the following facts: Defendant HCS and Defendant Gateway had a contract; Defendant Gateway controlled the persons assigned to it; and all work took place in Defendant Gateway's facilities.  Dkt. No. 52-1, p. 5.  However, Plaintiff claims Defendant "Gateway appeared to have shared the decision with [Defendant] HCS as Gateway and HCS had to determine what to put on [Plaintiff's] separation notice. . . the way the termination proceeded in this case[ ] left both parties with significant responsibilities."  Id. at p. 6.

The Court must address the degree of control Defendant HCS and Defendant Gateway had over Plaintiff to determine the entity responsible for the adverse employment decision alleged in Plaintiff's Second Amended Complaint.  Defendant HCS submitted the affidavits of Bonita Mikel, the then-project manager for the Brunswick office of HCS, and Cindy Ackerman, the Human Resources Manager for HCS, as well as the contract between Defendant HCS

and Defendant Gateway.[6]  Ms. Mikel and Ms. Ackerman both declare that HCS contracted with Gateway for HCS to "provide staffing services to Gateway" during the relevant time period.  Dkt. No. 36-4, p. 3, ¶ 9; Dkt. No. 36-5, p. 3, ¶ 10.  Both women declare that, per the terms of the contract, HCS accepted applications, screened applicants for employment who were to be assigned to Gateway, employed the individual during his assignment at Gateway, and paid the employee.  Dkt. No. 36-4, p. 3, ¶¶ 11-12; Dkt. No. 36-5, p. 3, ¶¶ 11-12.  However, Ms. Mikel and Ms. Ackerman assert Gateway made all of the following decisions: whether to approve an applicant prior to his assignment at Gateway; the criteria the individual had to possess to be eligible for assignment at Gateway; the compensation to be paid to the HCS employee; and whether the position was salaried or hourly.  Dkt. No. 36-4, pp. 3-4, ¶¶ 11, 14-15; Dkt. No. 36-5, pp. 3-4, ¶¶ 11, 14-15.  In addition, Gateway managed and controlled the HCS employees who worked at its facility, evaluated the HCS employees, issued reprimands, and handled any discipline of HCS employees assigned to Gateway. Dkt. No. 36-4, pp. 3-5, ¶¶ 12, 17, 19; Dkt. No. 36-5, p. 4,

---

[6]  The copy of the contract Defendant HCS submitted indicates the agreement became effective beginning July 1, 2012, dkt. no. 36-4, p. 17, which post-dates the adverse employment decision of June 29, 2012, but pre-dates any alleged adverse employment decision of July 9, 2012.  However, the parties raise no issue with the copy, which leads the Court to conclude the submitted version does not vary in significant manner from the contract which was in place on June 29, 2012.

¶¶ 17, 19. Ms. Mikel and Ms. Ackerman state that any HCS employee who was assigned to Gateway worked on Gateway's premises, not on those of HCS. Dkt. No. 36-4, p. 4, ¶ 18; Dkt. No. 36-5, p. 4, ¶ 18. Finally, as relevant to the issue of "control", Ms. Mikel and Ms. Ackerman state Gateway had the ability to terminate the assignment of an HCS employee, and cite to a provision of the contract between HCS and Gateway. Dkt. No. 36-4, p. 4, ¶ 16; Dkt. No. 36-5, p. 4, ¶ 16. That provision states: "CLIENT may request removal or transfer of AGENCY Personnel at any time, with or without cause. Requests for (sic) may be made either orally or in writing. All oral requests for removal must be confirmed by CLIENT in writing on the next business day."[7] Dkt. No. 36-4, p. 14, § 4.1.[8] Ms. Mikel and Ms. Ackerman assert that Plaintiff's supervisor at Gateway's CSU, Defendant Thompson, notified HCS during the week of June 25, 2012, that Plaintiff was not to return to the CSU because of "unsatisfactory job performance. Pursuant to the Contract, [HCS] was required to remove [Plaintiff] from the CSU assignment." Dkt. No. 36-4, p. 8, ¶ 40; Dkt. No. 36-5, p. 8, ¶ 40.

---

[7] HCS is identified as "AGENCY" and Gateway is identified as "CLIENT" pursuant to this contract. Dkt. No. 36-4, p. 11, ¶ 1.

[8] Ms. Mikel, Ms. Ackerman, and Defendant HCS's counsel cited to a section 2.5 of this contract as controlling. However, the version of the contract submitted to the Court does not contain a section 2.5.

In response, Plaintiff admits in his affidavit that he worked at what he "understood to be Gateway facilities," yet "it appeared to [him] that Gateway also employed me since my paychecks had Gateway on them and it appeared that Gateway and HCS had equal authority in firing me." Dkt. No. 52-3, p. 2, ¶ 8.

Plaintiff's impression that Defendants HCS and Gateway had equal authority to fire him is not based on admissible evidence and, this impression appears to go against all of the evidence presented. Because Defendant HCS did not have control of Plaintiff during his assignment to Defendant Gateway, Defendant HCS cannot be said to have made the adverse employment decision to terminate Plaintiff's assignment to Gateway on June 29, 2012. Of course, Defendant HCS would then have had "control" over Plaintiff from June 29, 2012, until his termination by Defendant HCS on July 9, 2012, and Defendant HCS is the entity which made an adverse employment decision against Plaintiff on July 9, 2012. Accordingly, there is sufficient evidence in the record to show that Plaintiff suffered adverse employment decisions by the Gateway Defendants and by Defendant HCS. However, the satisfaction of this prong does not equate automatically to a showing of a *prima facie* discrimination claim based on

circumstantial evidence, as a plaintiff must satisfy all four

(4) of the prongs of the McDonnell Douglas framework.[9]

### 2. Similarly situated

With respect to the second element of a *prima facie* case,

"the plaintiff and the comparator must be 'similarly situated'

'in all relevant respects.'" Jest v. Archbold Med. Ctr., Inc.,

561 F. App'x 887, 889 (11th Cir. 2014) (quoting Wilson, 376 F.3d

at 1091). When a plaintiff alleges that a person outside of his

protected classes "was treated more favorably," "[t]he

comparator must be nearly identical to the plaintiff to prevent

courts from second-guessing a reasonable decision by the

employer." Usry v. Liberty Reg'l Med. Ctr., Inc., 560 F. App'x

883, 890 (11th Cir. 2014) (quoting Wilson, 376 F.3d at 1091)

(alteration in original)).

Here, Plaintiff alleges that a white female (Defendant

Waldron) was treated more favorably than he, a black male.

Defendant Waldron testifies that she has been a Registered

---

[9] Defendant Gateway states it was not Plaintiff's employer. Dkt. No. 37-1, p. 4. Nevertheless, the relevant inquiry is to what entity had "control" over Plaintiff. The evidence bears out that Defendant Gateway had "control" over Plaintiff until June 29, 2012. Despite this distinction, the Court notes that Defendant HCS, as Plaintiff's employer, hired Plaintiff as an "at will" employee and could have ended Plaintiff's employment at any time, with or without cause. Dkt. No. 37-5, p. 14. It is worth noting that Plaintiff filed EEOC complaints against both Defendant HCS and Defendant Gateway, which indicates Plaintiff's displeasure with the end of his assignment on June 29, 2012, as well as his termination on July 9, 2012. Dkt. Nos. 9-1, 9-2. A finding as to which Defendant had "control" of Plaintiff as of June 29, 2012, or as of July 9, 2012, is not dispositive of the key issue before the Court—whether Plaintiff creates a genuine dispute as to any fact material to his discrimination claims.

Professional Nurse in Georgia since 1994 and is Board certified in psychiatric-mental health nursing. Dkt. No. 36-3, p. 1, ¶ 2. Defendant Waldron states she has worked in healthcare since 1992 and began working at Gateway in September 2003 as a nurse in the CSU. Id. at ¶¶ 3-4. Ms. Waldron also states she was promoted several times, including to the position of acting nurse manager for Gateway in March 2005. Id. at p. 2, ¶¶ 5-6. However, Ms. Waldron states there was a reorganization at Gateway in April 2012, which eliminated several administrative positions, including her position as acting nurse manager. Id. at p. 3, ¶ 12. Ms. Waldron declares she took some time off before applying with HCS, and she accepted a position as a charge nurse at Gateway. Id. at ¶¶ 13-14.

Plaintiff testified during his deposition that he obtained his Bachelor of Science in Nursing from Tuskegee University in 1982, and he has worked in the psychiatry field for 30 years. Dkt. No. 36-7, pp. 12, 23. Plaintiff conceded that he received a verbal reprimand on November 2, 2011. Id. at p. 77. Plaintiff also testified to having received a written reprimand from Ms. Kennedy, his supervisor with the ACT, on November 16, 2011, which indicated Plaintiff had "unsatisfactory" "behavior actions" for "lateness, [a] policy violation, [and] quality of work produced." Id. at p. 70. Upon clarification, Plaintiff did not dispute that he was reprimanded for having billed for

only one to two hours a day, even when he was out of the office all day, and for failing to turn in his notes or reports from the previous day's visits.  Id. at p. 71.

After receiving this written reprimand, Plaintiff later requested to be moved from the ACT, and he moved to the CSU at Gateway. Id. at p. 77.  Plaintiff stated he never received a reprimand while he was on the CSU which, to him, was "totally different[ ]" than having received a reprimand while on the ACT. Id. at p. 125.  Plaintiff testified that he had a telephone conversation with Defendant Thompson, his supervisor with the CSU, on June 29, 2012, at which time she informed him not to return to the CSU at Gateway.  Id. at pp. 110, 125.

Defendant Thompson declared she spoke with Defendant Waldron before hiring Plaintiff to join the CSU regarding Plaintiff's competency as a nurse and to seek Defendant Waldron's opinion about Plaintiff working in the CSU.  Dkt. No. 37-3, p. 2, ¶ 4.  According to Defendant Thompson, Defendant Waldron informed him she had had some issues with Plaintiff's handling of drugs and medications while he was on the ACT.  Id. Defendant Thompson also declared that a nurse practitioner who worked with Plaintiff on the CSU informed her that Plaintiff wanted to administer medications to CSU patients, even though these medications had not been prescribed properly.  Id. at pp. 2-3, ¶ 6.

Erica Kittles, who was the staffing coordinator for Defendant HCS at the time of Plaintiff's termination and who is the Plaintiff in Case Number 2:13-CV-138, was deposed by Defendants' counsel the day prior to Plaintiff's deposition. Ms. Kittles testified that she heard Defendant Thompson tell Ms. Barr that she (Defendant Thompson) wanted Plaintiff off of the CSU because Plaintiff "was not performing his job correctly[.]" Dkt. 37-6, p. 34. Plaintiff's termination notice indicated that he was being terminated for "unsatisfactory performance[,]" which Ms. Kittles understood to be consistent with Defendant Thompson's proffered reason for Plaintiff's termination. Id. at p. 36.

Even when all of this evidence is viewed in the light most favorable to Plaintiff, it fails to meet the similarly situated prong of the McDonnell Douglas test. To be similarly situated with Defendant Waldron, Plaintiff would have to show that Defendant Waldron had received written and verbal reprimands from supervisors and had reports of unsatisfactory job performance (as Plaintiff had received), yet was hired by Defendant HCS for assignment to Gateway to work as a charge nurse. Instead, the evidence shows Defendant Waldron had received several promotions and had experience working as acting nurse manager. She only lost that job because of an agency reorganization. At best, the evidence before the Court reveals

that Plaintiff and Defendant Waldron had the same certifications and many years' experience working in psychiatric nursing. This evidence does not show that Defendant Waldron and Plaintiff were "nearly identical" in their qualifications and past performance. Thus, Plaintiff cannot show that he was similarly situated with Defendant Waldron.[10]

### D. Legitimate, Non-Discriminatory Reason

Even assuming, *arguendo*, that Plaintiff could prove a *prima facie* case of discrimination, that showing would only create "a rebuttable presumption that the employer unlawfully discriminated against [him]." Joe's Stone, 296 F.3d at 1272. "[T]he burden then shifts to the employer to produce evidence that its action was taken for a legitimate, non-discriminatory reason." Brooks, 446 F.3d at 1162. If the employer produces such evidence, a court's "inquiry 'proceeds to a new level of specificity,' in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." Id. (quoting Joe's Stone, 296 F.3d at 1272-73). "Although the intermediate burdens of production shift

---

[10] The fourth prong of the McDonnell Douglas framework is whether the plaintiff was "qualified" for the position from which he was terminated. "[T]o demonstrate that he was qualified for the position, a Title VII plaintiff need only show that he . . . satisfied an employer's objective qualifications. The employer may then introduce its subjective evaluations of the plaintiff at the later stages of the McDonnell Douglas framework." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir. 2005). The Court need not address this prong of the McDonnell Douglas framework because, as noted above, Plaintiff failed to establish a genuine dispute as to any fact material as to the similarly situated prong and thus, he fails to establish a *prima facie* case of discrimination.

back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff." Id.

Defendants HCS and the Gateway Defendants assert Plaintiff was terminated from his assignment at Gateway because he was performing his job in an unsatisfactory manner.[11] Dkt. No. 37-1, p. 11; Dkt. No. 36-1, p. 12. This reason is a "legitimate, non-discriminatory reason" for Plaintiff's termination. Brooks, 446 F.3d at 1162.[12] Thus, Plaintiff must rebut this reason by showing the proffered reason was a pretext for discrimination. "[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993) (citation omitted). A reason is not pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination

---

[11] Although the Court determined Defendant HCS and the Gateway Defendants each made adverse employment decisions against Plaintiff, this portion of the Court's analysis focuses on the proffered reason for the end of Plaintiff's assignment with Defendant Gateway. The parties present their contentions to the Court in this way, especially considering Plaintiff's objection to his termination based on the proffered reason of "unsatisfactory job performance". The only evidence available shows that Defendant HCS terminated Plaintiff because it was unable to assign Plaintiff to any other facility, and Plaintiff has not challenged that decision. Rather, Plaintiff has focused on the termination of his assignment at Gateway.

[12] The Court notes Defendants' citation to Plaintiff's employment history, such as failing to disclose terminations from two (2) previous positions, as support for Plaintiff's lack of employability. Dkt. No. 37-1, p. 10. As Plaintiff's alleged lack of employability was not a proffered reason for Plaintiff's termination, the Court has limited any discussion of the "after-acquired evidence[.]" Id.

was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphases in original), *overruled in part on other grounds by* Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 169-70 (2009).

Plaintiff has not brought forth any evidence showing that the proffered reason to terminate his assignment is false and that the real reason Plaintiff was terminated from his assignment at Gateway was based on his race and/or gender. The Court notes that, under the contract between Defendant Gateway and Defendant HCS, Defendant Gateway had the authority to "request removal or transfer [of any HCS] Personnel at any time, with or without cause." Dkt. No. 36-4, p. 14. According to Ms. Mikel and Ms. Ackerman, Defendant Thompson informed Defendant HCS that Plaintiff was not to return to the CSU at Gateway because of "unsatisfactory job performance[ ]" and that Defendant HCS had no choice but to remove Plaintiff from his assignment at the CSU as a result. Dkt. No. 36-4, p. 8, ¶ 40; Dkt. No. 36-5, p. 8, ¶ 40.

Plaintiff declares that no one from the ACT unit or the CSU "ever told [him] that [he] performed unsatisfactorily." Dkt. No. 52-3, p. 2, ¶ 5. In addition, Ms. Kittles of HCS testified that she and Ms. Barr did not know what to put on Plaintiff's separation notice and that Plaintiff had to come back to HCS's

premises to get a completed separation notice. Dkt. No. 37-6, pp. 35, 49.

Even accepting Plaintiff's evidence in the light most favorable to him, Plaintiff fails to meet his burden of establishing that the proffered reason for terminating his assignment was pretextual. "An 'employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" Chapman, 229 F.3d at 1030 (quoting Nix v. WLCY Radio/Rahall Communc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984)). In other words, Plaintiff's disagreement with or unawareness of the reasoning for his termination does not make that reasoning unlawful. Plaintiff's and HCS's staff's ignorance of Gateways' dissatisfaction with Plaintiff's performance level is not relevant to whether Gateway's reason for ending his assignment was a pretext. Consequently, Defendants have shown a legitimate reason for terminating Plaintiff's employment, his unsatisfactory job performance, and Plaintiff has wholly failed to rebut that reasoning.

In sum, Plaintiff has not identified a substantially similar comparator, and he has not rebutted Defendants' legitimate non-discriminatory reason for his termination. Consequently, Defendants HCS, Gateway, Shearer, and Thompson are

entitled to summary judgment on Plaintiff's discrimination claims.

## II. Conspiracy (Count V)

"To state a claim under [42 U.S.C.] § 1985(3), a plaintiff must allege: (1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy (4) resulting in an injury to person or property, or a deprivation of any right or privilege of a citizen of the United States." Gibbs v. United States, 517 F. App'x 664, 669 (11th Cir. 2013) (citing Childree v. UAP/GA AG Chem., Inc., 92 F.3d 1140, 1146–47 (11th Cir. 1996)). "The language of Section 1985 which requires an intent to deprive one of equal protection or equal privileges and immunities means that there must be some racial or otherwise class-based invidiously discriminatory animus behind the conspirators' action." Byrd v. Clark, 783 F.2d 1002, 1007–08 (11th Cir. 1986), abrogated on other grounds by Nolin v. Isbell, 207 F.3d 1253, 1256 (11th Cir. 2000).[13]

---

[13] Plaintiff also brings claims pursuant to 42 U.S.C. § 1983 (Counts VI and VII). However, the Court need not address these Counts of Plaintiff's Second Amended Complaint. "Title VII and [S]ection 1983 claims have the same elements where the claims are based on the same set of facts." Rioux, 520 F.3d at 1275 n.5. Because the Court has determined Defendants are entitled to summary judgment on Plaintiff's Title VII claims, Defendants are likewise entitled to summary judgment on Plaintiff's Section 1983 claims.

Here, Plaintiff claims there was a conspiracy among Defendants Vanessa Shearer, Cathy Thompson, and Waldron to eliminate his job.[14] Dkt. No. 9, p. 34, ¶ 170. Plaintiff asserts these Defendants conspired to treat him in a disparate manner by "subjecting him to Defendants' unfair policies and practices insofar as dismissing [Plaintiff] based on his race and sex so that Defendants could hire a lesser qualified white female." Id. at ¶ 172.

As concluded above, Plaintiff fails to overcome his burden of establishing a genuine dispute as to any fact material to his discrimination claims. Thus, the alleged object of the claimed conspiracy — i.e., to treat Plaintiff in a disparate manner based on his race and gender — cannot be sustained as a matter of law. Consequently, Plaintiff cannot establish that the alleged conspirators' actions were motivated by some racial or otherwise class-based invidiously discriminatory animus.

Even if Plaintiff's allegations of discrimination *could* survive as a matter of law, he must set forth evidence creating a genuine dispute as to the formation of a conspiracy to carry out that discrimination. In this regard, Plaintiff testified during his deposition that he believed "there was a conspiracy to eliminate my job" by Defendants Shearer, Thompson, and

---

[14] Defendants HCS and Waldron aver that Section 1985 is inapplicable because Plaintiff's claims "are all premised on Title VII rights." Dkt. No. 36-1, p. 16. The Court need not assess this argument because the Court dismisses Plaintiff's conspiracy claims on other grounds.

Waldron and Ms. Barr. Dkt. No. 36-7, p. 148. Plaintiff stated he was "disappointed" with Defendant Waldron because he felt he "was wronged" because "[t]hey conspired. There was a group that conspired to take my position." Id. at pp. 149-50. Plaintiff also testified that Ms. Barr told him she was going to have to learn what Defendant Shearer said about his termination and whether he was going to work at another Gateway facility or would have to get another job. Id. at p. 174.

When pressed for details of a conspiracy, Plaintiff stated he did not know when the alleged conspiracy began, who else was involved, where the alleged conspirators met, or how they communicated. Plaintiff also stated he did not know what the alleged co-conspirators did in furtherance of this conspiracy, and all he knew is what he "read" and what he "heard." Id. at p. 176. Specifically, Plaintiff contends he relied on what Ms. Kittles told him and had written in a statement to the EEOC on his behalf, what Ms. Barr had said, and that he heard "several people" talking about Defendant Waldron taking his job. Id. at p. 175. Plaintiff testified that Defendant Waldron was "part of the conspiracy as far as [he was] concerned." Id. at p. 176. As for his evidence of Defendant Thompson's involvement in the alleged conspiracy, Plaintiff stated Defendant Thompson "was the one [who] told me to talk to [Ms. Barr]. So if she told me to talk to [Ms. Barr], that means she had talked to [Ms. Barr].

When I went to talk to [Ms. Barr], [she] said [Defendant Thompson] and I have been talking about you[.]" Id. at p. 178. Plaintiff testified about Ms. Barr's involvement in this alleged conspiracy as, "If you're going to terminate me, you're surely not going to give me a recommendation and then terminate me on an unsatisfactory job performance. That's so contrary. . . . I don't need [any] more. . . . I think there was a conspiracy to have me fired." Id. at p. 179.

Defendant Waldron affies she had "no role or input on the termination or any employment action" involving Plaintiff. Dkt. No. 36-3, p. 3, ¶ 15. Defendant Thompson declares that, while she did speak to Defendant Waldron about Plaintiff's competency and had received complaints about Plaintiff's work performance, she had Defendant Waldron work with Plaintiff in the hope of addressing her concerns about Plaintiff. Dkt. No. 37-3, pp. 2-3, ¶¶ 4-5, 7, 10. Defendant Thompson also declares she did not request that HCS terminate Plaintiff to make a position available for Defendant Waldron. Id. at p. 4, ¶ 11.

Plaintiff presents nothing which counters the sworn statements of Defendants Waldron and Thompson, even though he had the opportunity to do so through his own affidavit and statement of material facts. See Dkt. Nos. 52-2, 52-3. At best, Plaintiff's deposition testimony reveals his supposition that, because Ms. Barr wrote a letter of recommendation on his

behalf after his termination and Ms. Barr and Defendant Thompson spoke about him, a conspiracy must have existed. Dkt. No. 36-7, p. 170. Such speculation cannot create a dispute of material fact.

Plaintiff also points to the testimony of Ms. Kittles to establish the formation of a conspiracy. She testified that HCS had no full-time nursing positions available when Defendant Waldron came in to apply for nursing positions until Ms. Barr spoke with Defendant Shearer. However, Ms. Kittles also testified she could not hear the conversation between Ms. Barr and Defendant Shearer and had no idea of the content of their conversation. Dkt. No. 37-6, pp. 124-25. Again, even accepting Ms. Kittles' testimony as true, her deposition fails to set forth any competent evidence of a conspiracy.

Plaintiff's claim that Defendants Thompson, Shearer, and Waldron and Ms. Barr conspired together to have him fired is not supported by any evidence; rather, his claim is based on conjecture, which is not enough to create a genuine dispute as to any fact material to a conspiracy claim. Puglise v. Cobb Cnty., Ga., 4 F. Supp.2d 1172, 1181 (N.D. Ga. 1998) ("While the plaintiffs need not produce direct evidence of a meeting of the minds, they must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective to obstruct the plaintiffs' access

to the courts; mere speculation and conjecture will not suffice.") (citing Hinkle v. City of Clarksburg, 81 F.3d 416, 421-23 (4th Cir. 1996)). Plaintiff fails to carry his burden, and Defendants Thompson, Shearer, and Waldron are entitled to summary judgment on this Count.

## III. Intentional Infliction of Emotional Distress (Count VIII)

To establish an intentional infliction of emotional distress claim under Georgia law, a plaintiff must prove the following four elements: "(1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe." Bartholomew v. AGL Resources, Inc., 361 F.3d 1333, 1339 (11th Cir. 2004)(citations and punctuation omitted); Trimble v. Circuit City Stores, Inc., 469 S.E.2d 776, 778 (Ga. Ct. App. 1996)(citation omitted). In order to meet the second element, the plaintiff must show that the defendants' "behavior was so extreme or outrageous that 'no reasonable man could be expected to endure it.'" Hammer v. Slater, 20 F.3d 1137, 1144 (11th Cir. 1994)(quoting Bridges v. Winn-Dixie Atlanta, Inc., 335 S.E.2d 445, 448 (Ga. Ct. App. 1985)); Guthrie v. Waffle House, Inc., 460 F. App'x 803, 809 (11th Cir. 2012).

"The existence of a special relationship between the actor and victim, such as that of employer to employee, may make

otherwise non-egregious conduct outrageous." Trimble, 469

S.E.2d at 778. However, "Georgia courts have held that an

employer's termination of an employee—however stressful to the

employee—generally is not extreme and outrageous conduct."

Clark, 990 F.2d at 1229 (citing ITT Rayonier, Inc. v. McLaney,

420 S.E.2d 610, 612 (Ga. Ct. App. 1992); Borden v. Johnson, 395

S.E.2d 628, 630 (Ga. Ct. App. 1990); and Lane v. K-Mart Corp.,

378 S.E.2d 136, 138 (Ga. Ct. App. 1989)).

Plaintiff offers no reason why this Court should depart

from this general rule. Instead, Plaintiff alleges in the most

conclusory fashion that "Defendants" "[told] everyone but" him

"that they plan[ned] to fire him and replace him with a white

female." Dkt. No. 51-1, p. 8; Dkt. No. 52-1, p. 8. Plaintiff

claims Defendants "act[ed] disgracefully, bantering back-and-

forth suggested creations that they hope someone will believe.

[They] then manufacture this web of deceit accusing [Plaintiff]

of terrible things that no one will mention to him." Id. at pp.

8-9; Dkt. No. 51-1, p. 8.

Even viewing Plaintiff's allegations in the light most

favorable to him, his intentional infliction of emotional

distress claim fails as a matter of law. Plaintiff cites to no

evidence that Defendants acted in an intentional or reckless

manner with conduct that was outrageous. Moreover, the record

is bereft of any evidence that, even if Defendants conducted

themselves in an outrageous manner, Plaintiff suffered any emotional distress as a result of Defendants' actions. For all of these reasons, Defendants are entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claims.

## IV. Attorney's Fees (Count IX)

In any action or proceeding to enforce a provision of sections 1981, 1981a, . . ., 1983, 1985, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs[.]" 42 U.S.C. § 1988. As Plaintiff is not a prevailing party on any of his enumerated claims, any request for attorney's fees must be denied.

CONCLUSION

Based upon the foregoing, the Court hereby **GRANTS** Defendants Healthcare Staffing, Inc.'s, and Waldron's Motion for Summary Judgment, and Defendants Gateway's, Shearer's, and Thompson's Motion for Summary Judgment. Dkt. Nos. 36 & 37. The Clerk of Court is directed to **ENTER FINAL JUDGMENT** in favor of Defendants and to **CLOSE** this case.

**SO ORDERED**, this 30 day of March, 2015.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA